UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARAJ KIDWAI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No.: 4:12-cv-00455 |
| | § | |
| ST. MATTHEW'S UNIVERSITY | § | |
| SCHOOL OF MEDICINE, JOHN | § | |
| P. DOCHERTY, W. CHRISTOPHER | § | |
| CROLEY and BARRY J. COOPER | § | |
| Defendants. | § | |

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP 12 (B) (2)
AND MEMORANDUM IN SUPPORT THEREOF**

_____


Mark A. Weitz
SB# 21116500
SD Bar # 102493
Weitz Morgan PLLC
100 Congress Avenue, Suite 2000
Austin, Texas 78701
512-394-8950 (direct)
512-657-1849 (mobile)
512-852-4446 (facsimile)
ATTORNEY FOR PLAINTIFF
MARAJ KIDWAI

TABLE OF CONTENTS

Page

I.    Factual Background                                                          1

II.   Jurisdictional Facts                                                        2

III.  Legal Arguments and Authorities                                            4

      A.    Standard and Burden for Constitutional Assertion of Jurisdiction     4

      B.    Minimum Contacts Generally                                           5

      C.    Contracts and Minimum Contacts                                       6

      D.    Torts and Minimum Contacts                                           7

      E.    The Internet and Minimum Contacts                                    9

      F.    Traditional Notions of Fair Play                                    11

IV.  Facts Applied to the Law                                                   12

      A.    Exercise of Personal Jurisdiction over SMU Based On
            Related Minimum Contacts:                                           12

            (i)     Internet Contact:                                           12

            (ii)    Contractual Relationship                                    14

      B.    Jurisdiction over SMU Based on General Unrelated Contacts           16

            (i)     Clinical Rotations                                          16

            (ii)    Internet as a Source of General Contacts                    18

            (iii)   Other Unrelated Factors                                     20

            (iv)    Viewing the General Contacts in "Toto"                      20

      C.    Jurisdiction Over the Trustees Based on Specifically
            Related Contacts                                                    22

      D.    Defendant Trustees' General Contacts As a Basis of Jurisdiction     23

E.      Litigation in Texas Does not Violate Traditional Notions
        of Fair Play                                                    24

V.      Conclusion                                                      27

TABLE OF AUTHORITIES

CASES:                                                                                    Page

*Access Telecom, Inc. v. MCI Telecommunications Corp,* 197 F.3d 694
(5th Circ., 1997, rehearing denied, cert denied)                                        5, 23

*Aerotech Holdings, Inc. v. Alliance Aerospace Engineering, LLC,*
650 F. Supp. 2d 594 (N.D. Tex. 2009)                                                      7

*Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806  (Tex.2002)            4, 6, 17

*Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 113, 107
S.Ct. 1026, 94 L.Ed.2d 92 (1987).                                                         11, 25

*Bellorin v. Bridgestone/Firestone,* 236 F. Supp. 2d 670 (W.D. Texas, 2001)               9, 13,
                                                                                          15

*Carrot Bunch Co., Inc. v. Computer Friends, Inc.,* 218 F. Supp. 2d 820
(N.D. Tex. 2002)                                                                          10

*Choice Auto Brokers, Inc. v. Dawson,* 274 S.W.3d 172
(Tex.App.-Houston [1 Dist.] 2008)                                                         10, 13,
                                                                                          19

*Daimler-Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 724
(Tex. App.—Austin, 2000)                                                                  9-11,
                                                                                          13, 19

*Electrosource, Inc. v. Horizon Battery Technologies, Ltd.,* 176 F.3d 208
(5th Cir, 1999)                                                                         5-7,
                                                                                          15-16,
                                                                                          23

*FCA Invs. Co. v. Baycorp Holdings, Ltd.,* No. 01-20717, 2002 WL 31049442,
at *3 (5th Cir. Aug. 29, 2002)                                                            8, 23,
                                                                                          25

*Gehling v. St. George's Sch. of Med., Ltd.,* 777 F.2d 539, 542 (3d Cir. 1985)            21

*General Electric Co. Inc. v. Brown & Ross Intern. Distributors, Inc.*
804 S.W. 2d 527 (Tex. App.-Houston [1[st] Dist.], 1990)                                   5, 6

iv

Page

*Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC,* 255 F. Appx. 775, 777, 794-95 (5th Cir. 2007)   9

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)   4, 5

*Hayes v. Wissel,* 882 S.W.2d 97, 99 (Tex.App.--Fort Worth 1994, no writ)   5

*Hupp v. Siroflex of America, Inc.* 848 F. Supp. 744 (S.D. Tex. 1994)   7, 22

*Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L. Ed. 95 (1945)   4

*J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780, 2787 (2011)   9, 23, 25

*Jones v. Beech Aircraft,* 995 S.W.2d 767, 773 (Tex. App.--San Antonio 1999, pet. dism'd w.o.j.)   9-10, 13

*Jones v. Petty-Ray Geophysical Geosource, Inc.* 954 F. 2d 1061 (5th Cir. 1992)   14

*Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex. 1985)   4

*Latshaw v. Johnson*, 167 F. 3d 208 (5th Cir 1999)   7, 15

*Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001)   8, 23, 25

*McFaden v. Gerber,* 587 F.3d 753 (5th Cir. 2009)   6, 11, 17

*McNamara v. Bre-X Minerals Ltd.*, 46 F. Supp. 2d 628 (E.D. Tex. 1999)   6, 16, 23

*Mieczkowski v. Masco Corp.*, 997 F. Supp. 782 (E.D. Tex. 1998)   11, 13

*Mink v. AAAA Development LLC,* 190 F.3d 333 (5th Cir. 1999)   5, 16

*Mobius Risk Group v. Global Clean Energy Holdings, Inc.* Civil Action No. H-10-1708 (S.D. Tex., February 22, 2012)   8

*Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex. 2007)   6, 18

v

|  | Page |
|---|---|
| *Moncreif Oil Intern., Inc. v. OAO Gazprom,* 481 F. 3d 309  (5th Cir., 2007) | 6 |
| *Mullins v. TexasAmerica, Inc.,* 564 F.3d 386 (5th Cir 2009) | 7 |
| *Nikolai v. Strate,* 922 S.W.2d 229, 236 (Tex.App.--Fort Worth 1996, writ denied) | 5 |
| *Nordica USA Corp. v. Ole Sorensen*, 475 F. Supp. 2d 128 (D.N.H. 2007) | 24 |
| *Phillip Morris USA, Inc. v. Lee*, 494 F. Supp. 2d 544 (W.D. Tex 2007) | 8 |
| *Powerhouse Productions, Inc. v. Widgery*, 564 F. Supp. 2d 672 (E.D. Tex. 2008) | 11, 13 |
| *Reiff v. Roy,* 115 S.W.3d 700, 705 (Tex.App.-Dallas 2003, pet. denied) | 13 |
| *Rossi v. Wohl,* 246 F. Appx. 856, 858 (5th Cir. 2007) | 8 |
| *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990) | 4, 6 |
| *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982) | 4 |
| *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964  (1st Cir. 1997) | 24 |
| *Wien Air Alaska v. Brandt,* 195 F.3d 208, 213 (5th Cir, 1999) | 8, 23, 25 |
| *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) | 11 |

STATUTES AND OTHER AUTHORITIES

| Tex. Civ. Prac. & Rem. Code Ann. § 17.042 | 4 |
|---|---|

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP 12 (B) (2)
AND MEMORANDUM IN SUPPORT THEREOF**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Maraj Kidwai, Plaintiff in the above styled and numbered cause and files his Response to the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and would show the Court as follows.

## I. Factual Background

1.    Plaintiff Maraj Kidwai is a U.S. citizen and Texas resident. In December 2006 he transferred from St. George's Medical School in Grenada to the Defendant, St. Matthews University School of Medicine in the Cayman Islands (SMU). When he transferred the graduation requirements, as mandated by SMU's trustees required that he pass the USMLE Step 1 exam, but there was no requirement that he or any other student pass the Step 2 exam. The graduation requirements were provided in SMU's catalog that was available on its web-site.

2.    The graduation requirements appeared every year in the new catalog and remained unchanged until May 2010.  In May 2010, with no notice and no grace period the trustees of SMU changed the graduation requirements for any student graduating after May 2010 to require passing the USMLE Step 2 exam.  A student had three opportunities to pass the exam. If he or she failed to do so they were dropped from the program despite having met the graduation requirements that existed when they enrolled, and having paid almost 100% of their tuition.

3.    In January 2012 Plaintiff sued SMU for breach of contract and its trustees for intentional misrepresentation.  The facts as known to the Plaintiff indicate that for the entire period the Plaintiff was enrolled, up to the date of the change, the trustees were attempting to change the

1

graduation policy and yet not only failed to reveal that to the student body, but continued to represent to existing and prospective students that the requirements remained unchanged.

## II.  Jurisdictional Facts

4.      Defendant St. Matthews University School of Medicine (SMU) is a Cayman domiciled for-profit medical school with administrative offices in Orlando, Florida.  While the classroom portion of its curriculum occurs in the Cayman Islands, almost 100% of its clinical rotations occur outside the Caymans and the vast majority of its clinical curriculum takes places in hospitals throughout the United States.  Clinical rotations consist of 3rd year core and 4th year electives, with each providing 50% of the total clinical requirement. For purposes of the 4th year elective rotations SMU students can choose among over 25 hospitals across the United States, once of which is University of Texas Southwestern Medical Center in Dallas, Texas.

5.      SMU has only been in existence since 1997.  One hundred percent of its revenue is derived from student tuition and based on its web-site and its on-line catalog, over 75% of its student enrollment comes from the United States.  Plaintiff spent over $100,000 in tuition alone during the course of his four years at SMU. Of the total student enrollment number Texas provides a significant number of students. In the Plaintiff's class alone there were ten out of a total of only 90 enrolled. Since 2008 SMU has provided no student financial aid, nor does it provide scholarships.

6.      SMU's sole means of enrolling students is via its web-page marketing and an important part of that marketing system includes alumni testimonials.  The web-marketing is therefore crucial to SMU's economic survival and it focuses on Texas and includes a significant number of Texas alumni testimonials.   John Marvin's affidavit states the web-page does not focus specifically on Texas, but a review of the web-page reveals that it is designed to appeal to Texas

students as well as students from other places in the United States.  In addition, the web-site is not "passive" as defined by Texas law, but rather is "active"

7.     In addition to the recruitment of students, SMU recruits and employs academic professionals from Texas as evidenced by its web-page testimonials and faculty biographical summaries.  In addition, its parent, R3 Education also runs a school of veterinary medicine from the same facilities as the medical school. The vet school also recruits and employees academic professionals form Texas.

8.     In addition to its full-time faculty, SMU solicits and maintains on-going relationships with academic and medical professionals from Texas schools and hospitals that regularly act as guest speakers and lecturers at SMU seminars that play a role in the overall education provided to SMU students.  In addition its faculty maintains continuous and systematic relationships with Texas based organizations and routinely travels to Texas for professional events and conferences.

9.     While some of these activities have been defined as the activities of a nationally prominent educational institution, SMU is neither "national" nor "prominent," but rather is a small, obscure medical school located in the Cayman Islands. In at least four jurisdictions in the United States and the United Kingdom its graduates cannot sit for licensure.  Its Internet student recruiting activity is literally its sole means of support and it is specifically directed at Texas among other portions of the United States.  SMU's elective clinical rotations in Texas provide a continuous and systematic forum for its post-classroom curriculum and is consistently used by students even under John Marvin's rendition of the facts.  It recruits teachers and clinicians from Texas and draws on Texas professionals for its non-classroom seminars, lectures, and workshops.

10.     Plaintiff has sued SMU for breach of contract and its three trustees for intentional misrepresentation.  It is within the context of these claims and the facts surrounding jurisdiction that the Plaintiff currently has at his disposal that the assertion of jurisdiction in Texas must be evaluated.

### III. Legal Argument and Authorities

**A.     Standard and Burden for Constitutional Assertion of Jurisdiction**

11.     Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex. 2002), (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

12.     A Texas court may exercise jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991); see Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (West 1997 & Supp.2000). The broad language of the long-arm statute permits an expansive reach, limited only by the federal constitutional requirements of due process. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). As a result, the only consideration is whether it is consistent with federal due process for Texas courts to assert personal jurisdiction over a non-resident defendant. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,*  815 S.W.2d 223, 226.

13.     A defendant who challenges a court's exercise of personal jurisdiction carries the burden of negating all basis of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985); *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982);

*Nikolai v. Strate,* 922 S.W.2d 229, 236 (Tex.App.--Fort Worth 1996, writ denied); *Hayes v. Wissel,* 882 S.W.2d 97, 99 (Tex.App.--Fort Worth 1994, no writ).

**B.      Minimum Contacts Generally:**

14.      Minimum contacts sufficient to maintain jurisdiction over a non-resident defendant can be established two ways, either through contacts that support general personal jurisdiction or those that support specific personal jurisdiction. General contacts exists when a defendant's contacts within the forum state are continuous and systematic, but unrelated to the cause of action, *Mink v. AAAA Development LLC,* 190 F.3d 333 (5th Cir. 1999). In contrast, specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum, *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227.

15.      General personal jurisdiction is assessed by evaluating the defendant's contacts with the forum state over a reasonable number of years up to the date the suit was filed.  In determining if the non-resident defendant's contact with the forum state are sufficient for purposes of general jurisdiction those contacts are examined "in toto" rather than scrutinizing each contact individually.  Therefore, even if general contacts are independent of one another, if they occur in a continuous and systematic manner, they will support general personal jurisdiction, *Access Telecom, Inc. v. MCI Telecommunications Corp,* 197 F.3d 694 (5th Circ., 1997, rehearing denied, cert denied).

16.      The application of the rule for general in personam jurisdiction will vary with the nature and quality of the defendant's contacts, but one aspect that does not change is that the defendant must have purposely availed itself of the privilege of conducting activities in the forum state, *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.,* 176 F.3d 208 (5th Cir, 1999); *General*

*Electric Co. Inc. v. Brown & Ross Intern. Distributors, Inc.* 804 S.W. 2d 527 (Tex. App.-Houston [1st Dist.], 1990); *Schlobohm v. Schapiro* 784 S.W. 2d 355.  However, the test does not depend on the quantity of activity in the forum state, but rather the quality and nature of that activity that is important,  *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806.

17.     There are at least three aspects to the " purposeful availment" inquiry: First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. Second, the contacts with the forum must be " purposeful" rather than " random, isolated, or fortuitous." Third, the defendant must seek some benefit, advantage, or profit by ' availing' itself of the jurisdiction, *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex. 2007).

18.     The test is more simply viewed as an issue of foreseeability.  To assert jurisdiction over a non-resident defendant, its contacts with the forum state must be sufficient so that it could reasonably anticipate being haled to court in that state, *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.,* 176 F.3d 208 (5th Cir, 1999); *McNamara v. Bre-X Minerals Ltd*., 46 F. Supp. 2d 628 (E.D. Tex. 1999).   In making the determination no one factor is conclusive, the touchstone is whether the defendant's conduct makes it reasonable to anticipate he could be sued in the forum state, *McFaden v. Gerber,* 587 F.3d 753 (5th Cir. 2009).

**C.     Contracts and Minimum Contacts:**

19.     While merely contracting with a resident of a forum state does not provide sufficient minimum contacts for purposes asserting personal jurisdiction, *Moncreif Oil Intern., Inc. v. OAO Gazprom,* 481 F. 3d 309   (5th Cir., 2007), the act of contracting is but the first step in determining whether a contract with a forum state resident provides sufficient minimum contacts for jurisdiction purposes.

20.     The Fifth Circuit has held that a "highly realistic approach" is called for in determining minimum contacts in the context of contractual relationships.   Courts must recognize that a contract is ordinarily just the first step in tying up prior negotiations and the future consequences which are the real object of the business transaction.   Actual course of dealing must be evaluated to determine if an out-of-state party purposely availed itself of doing business in the forum state, *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.*, 176 F.3d 867 (5th Cir. 1999); *Latshaw v. Johnson*, 167 F. 3d 208 (5th Cir 1999).

**D.     Torts and Minimum Contacts:**

21.     Under existing law the fact that a tortfeasor commits a tort outside of the forum state is not dispositive of whether that act gives rise to personal jurisdiction. The Fifth Circuit has clearly held that for purposes of long-arm tort jurisdiction under Texas law the tort is committed where the resulting injury occurs, *Hupp v. Siroflex of America, Inc.* 848 F. Supp. 744 (S.D. Tex. 1994). That same court has more recently gone farther in clarifying the effect of a non-resident's tort committed outside the state.   In *Mullins v. TexasAmerica, Inc.,* 564 F.3d 386 (5th Cir 2009) the court held that an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to flow from the non-resident defendant's conduct.

22.     Other Texas federal jurisdictions have acted consistently with the Fifth Circuit's analysis. In *Aerotech Holdings, Inc. v. Alliance Aerospace Engineering, LLC,* 650 F. Supp. 2d 594 (N.D. Tex. 2009) the Court held that under the "effects test" for determining if a defendant could anticipate being sued in Texas for a tort committed outside the state, the act of committing a tort outside the state that causes tortious injury within the state amounts to sufficient minimum

contacts with the forum state to constitutionally permit both state and federal courts in Texas to exercise personal jurisdiction over the non-resident tortfeasor, see also *Phillip Morris USA, Inc. v. Lee*, 494 F. Supp. 2d 544 (W.D. Tex 2007).

23.    In *Mobius Risk Group v. Global Clean Energy Holdings, Inc.* Civil Action No. H-10-1708 (S.D. Tex., February 22, 2012) Judge Rosenthal confronted this issue in a motion to dismiss based on lack of personal jurisdiction.  He began by noting that Fifth Circuit precedent held that allegations of fraudulent representations directed to a forum-state resident are sufficient for a *prima facie* showing of specific jurisdiction. *See also Rossi v. Wohl,* 246 F. Appx. 856, 858 (5th Cir. 2007) (holding that allegations that the defendants "communicated false information to the plaintiff in Texas" "are sufficient to raise a prima facie case of specific personal jurisdiction against the defendants"); *FCA Invs. Co. v. Baycorp Holdings, Ltd.,* No. 01-20717, 2002 WL 31049442, at *3 (5th Cir. Aug. 29, 2002) (holding that allegations that a nonresident defendant "used false assurances and misrepresentations made in, or sent to, Texas to induce" the plaintiff's detrimental reliance provide sufficient basis for exercising specific jurisdiction over that defendant).

24.    Holding that the Fifth Circuit's interpretation of that law was binding, Judge Rosenthal reasoned that when the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment. The defendant is purposefully availing himself of the privilege of causing a consequence in Texas, *Wien Air Alaska v. Brandt,* 195 F.3d 208, 213 (5th Cir, 1999). See also *FCA Invs*., 2002 WL 31049442, at *2 ("In cases alleging the intentional tort of fraud, the defendant's participation in a single telephone call is enough to establish personal jurisdiction if the content of the call gave rise to the fraud claim."); *Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001) ("A single act by a defendant can be

enough to confer personal jurisdiction if that act gives rise to the claim being asserted."); *J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780, 2787 (2011) (plurality opinion).

25.    In denying the individual corporate officer's motion to dismiss Judge Rosenthal held that if the evidence suggests that the nonresident officer participated in tortious or fraudulent activities, which were directed at Texas and for which he may be held personally liable, then there is a sufficient basis to assert specific jurisdiction over him. Because Mobius alleged that the officer committed fraud, an intentional tort, the fiduciary-shield doctrine did not bar the exercise of personal jurisdiction over him. *See Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC,* 255 F. Appx. 775, 777, 794-95 (5th Cir. 2007) (holding that the fiduciary-shield doctrine did not bar the exercise of personal jurisdiction over a nonresident defendant when the plaintiff alleged that the defendant induced it to purchase a franchise through fraudulent misrepresentations).

**E.    The Internet and Minimum Contacts:**

26.    It is undisputed that SMU's sole means of recruiting students to its school is through the Internet.  SMU has no marketing presence in the United States or Texas other than its web-site. For purposes of personal jurisdiction, Texas law divides Internet sites and activities into three categories of interaction. On one end of the scale, defendants who use the Internet to make contacts with residents in other jurisdiction and to repeatedly and knowingly transmit computer information are said to be doing business over the Internet and are subject to personal jurisdiction in Texas.  *Bellorin v. Bridgestone/Firestone,* 236 F. Supp. 2d 670 (W.D. Texas, 2001); *Reiff v. Roy,* 115 S.W.3d 700, 705 (Tex. App.-Dallas 2003, pet. denied); *Daimler-Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 724 (Tex. App.—Austin, 2000); *Jones v. Beech Aircraft,* 995 S.W.2d 767, 773 (Tex. App.--San Antonio 1999, pet. dism'd w.o.j.)**.**

27.     In the middle of the two extremes are web sites that allow users to exchange information and to communicate with the corporation. *Daimler-Benz,* 21 S.W.3d at 724. While this level of interaction is insufficient by itself to establish personal jurisdiction over a non-resident defendant, it may be considered as contact, along with the other contacts that exist in this case. *Daimler-Benz,* 21 S.W.3d at 725 (applying the law to a web site operated by a foreign corporation); *Jones,* 995 S.W.2d at 773 (recognizing that an interactive website that allows visitors to e-mail the company may be considered in the minimum contacts inquiry).

28.     A website that provides advertising and some interactivity is more than a passive web-site, *Choice Auto Brokers, Inc. v. Dawson,* 274 S.W.3d 172 (Tex. App.--Houston [1 Dist.] 2008). However, one must look at the degree of interactivity to determine if the web-site is one that creates sufficient minimum contacts on its own, or falls short of that but may be considered in the overall evaluation of a defendant's contacts. For example, in *Dawson* customers were able to email CAB through the website to schedule a test drive or request additional information about the vehicle. But the website did not allow a customer to enter into a contract or purchase a vehicle directly.  Instead it routed the customer to eBay, where CAB had no control over who would be the highest bidder.

29.     In evaluating web-site activity as the basis for personal jurisdiction Texas courts have allowed the exercise of jurisdiction where the Defendant intentionally directs tortious activity toward Texas, *Carrot Bunch Co., Inc. v. Computer Friends, Inc.,* 218 F. Supp. 2d 820 (N.D. Tex. 2002).  Likewise, in a contractual setting, personal jurisdiction has been sustained where a web-site went beyond mere advertising and provided extensive information for goods or services to be selected by the computer user in Texas, allowed orders to be placed on the site, and permitted

the user to establish electronic mail contact with customer representatives, *Mieczkowski v. Masco Corp.*, 997 F. Supp. 782 (E.D. Tex. 1998).

30.     In *Powerhouse Productions, Inc. v. Widgery*, 564 F. Supp. 2d 672 (E.D. Tex. 2008) the court refused to allow the exercise of personal jurisdiction over a Colorado company based upon its web-site.  However, the Court's reasoning illustrates what would sustain personal jurisdiction in Texas.  The Colorado site allowed purchasers to review the site, purchase products, and receive a welcome kit.  However, it did not solicit business or allow users to provide information to the company or otherwise interact with the company in any way.  As set out in Section IV, herein below, SMU's web-site possesses all the attributes of a web-site that exists at the end of the spectrum permitting the exercise of personal jurisdiction.

**F.     Traditional Notions of Fair Play:**

31.     Even if a defendant has established minimum contacts with the forum state, a Texas court may still dismiss the suit for lack of personal jurisdiction if maintaining it violates traditional notions of fair play and substantial justice, that is, if it is unfair or unreasonable, *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).  Courts will generally examine this reasonableness prong of the federal due process test by looking at five factors: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies, *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

32.    A corporation or individual's significant contacts with Texas, whether directly or indirectly, and its goal to increase its market presence in North America including Texas has been held to lessen the burden on it to defend suit in Texas. In addition, a Plaintiff's choice to bring its suit in Texas indicates a significant interest in obtaining convenient and effective resolution of their claims. Where a Plaintiff submits evidence sufficient to support an argument that a non-resident defendant attempts to market and sell its product by injecting it into the stream of commerce destined for the United States and Texas, the policy interests of federal government are not hindered by Texas's exercise of personal jurisdiction over a non-resident foreign defendant. *Daimler-Benz,* 21 S.W.3d at 726 ("The federal government's foreign policy interests are not hindered when individual states ensure that international companies operate in an equitable business environment in which wrongs are redressed by those responsible.").

33.    Once sufficient minimum contacts have been established the interests of the forum and the plaintiff justify even large burdens on the non-resident defendant, *McFaden v. Gerber,* 587 F.3d 753 (5th Cir. 2009).

## IV.  Facts Applied to the Law

**A.    Exercise of Personal Jurisdiction over SMU Based On Related Minimum Contacts:**

**(i) Internet Contact:**

34.    The starting point is SMU's contact with the Plaintiff.  It is axiomatic that a web-page by its nature is directed at more than one situs.  Thus, while Texas and its residents cannot be said to be the sole focus of the site, it is clearly intended to reach Texas residents as a portion of the United States population that comprises 75 % of its student base.  An examination of the web-page reveals the following:

a.   It is clearly accessible to Texas residents **[Exhibit A: Kidwai Affidavit, ¶2, 4, 7-9, ; Marvin Affidavit ¶19-20**].

b.   It is the sole means of advertising and recruitment for SMU both in terms of students and faculty.  Other than an administrative office in Orlando, Florida that provides certain administrative services to SMU, SMU's sole means of contact is its web-site. **[Marvin affidavit ¶4, 12, 17].**

c.   The web-site is clearly soliciting students and employees. It provides not only a full explanation of the school and it services, but the only explanation available as to the school and its services.  It provides a full-range of information as to cost.  Contrary to John Marvin's affidavit **[Marvin Affidavit ¶21]** the application process not only allows an applicant to complete and submit the application from his or her forum state, but the subsequent e-mail contact is facilitated via the web-site.  As set out in *Powerhouse Productions, Inc. v. Widgery*, 564 F. Supp. 2d 672, the web-site does not have to provide the contact, it must provide the ability to do so.  SMU's web-site does so even before someone is accepted.

d.   The web-site contains all the attributes of Internet use to make contacts with residents in other jurisdictions and to repeatedly and knowingly transmit computer information. By so doing SMU is doing business over the Internet and is amenable to jurisdiction of the forum state. *Bellorin v. Bridgestone/Firestone,* 236 F. Supp. 2d 670 ; *Reiff v. Roy,* 115 S.W.3d 700, 705; *Daimler-Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 724; *Jones v. Beech Aircraft,* 995 S.W.2d 767, 773**.** From the moment a student applies he or she is required to create a user number and password.  Communication thereafter occurs by e-mail to and from the e-mail addresses provided by both parties in the application process.

e.   Once a student is accepted he or she receives an SMU-online account with a new e-mail and the ability to continue to interact with SMU on a more detailed an individual basis. The SMU-online account becomes the communication vehicle to include the payment of all fees and expenses by the applicant/student from his forum state of residence. **[Kidwai Affidavit ¶6-7].** It is impossible to argue that the SMU web-site, its sole means of advertising and recruitment, is not a web-site that goes beyond mere advertising. It provides extensive information for goods or services to be selected by the computer user in Texas, allows orders, (or in this case applications) to be placed on the site, and permits the user to establish electronic mail contact with customer representatives (or in this case admissions officials).  In virtually every way the SMU web-site meets the factual criteria set out in  *Mieczkowski v. Masco Corp.*, 997 F. Supp. 782 for the exercise of personal jurisdiction and John Marvin's affidavit concedes as much. **[Marvin Affidavit ¶17, 20, 21].**

f.   Unlike the situation in *Dawson* where the website did not allow a customer to enter into a contract and routed the customer to eBay, where CAB had no control over who would be the buying, SMU's website allows for the entire application process to occur on-line and it has complete control over who pays.

13

35.     In short, based on SMU's web-page and the sworn testimony of its Chancellor, it would be difficult to conceive what transactions and information transfer does not take place on the web-page.  The only part of the application process that was not accomplished on the web-page or via e-mail was the Plaintiff's signing a *Letter of Intent and Seat Deposit Form* **[Marvin Affidavit ¶23].**  That letter was signed and the deposit paid by the Plaintiff from his home in Houston, Texas **[Kidwai Affidavit ¶7].**  Based on the law that governs the use of the Internet for the purpose of doing business and entering contracts, SMU clearly acted purposefully with regard to the Plaintiff and his connections to Texas.

**(ii) Contractual Relationship:**

36.     A contract can form the basis of specific personal jurisdiction where the agreement is to be performed at least in part, in the forum state.  By determining this factor Courts are able to judge whether a defendant acted purposefully and thus satisfied the need for specifically related minimum contacts, *Jones v. Petty-Ray Geophysical Geosource, Inc.* 954 F. 2d 1061 (5th Cir. 1992).  At the time Defendant SMU entered into its agreement with the Plaintiff it knew the following about performance:

a.      The Plaintiff was a Texas resident, his application form made that fact clear;

b.      That if the Plaintiff completed his curriculum and satisfied the contractual requirements for a degree he would spend one year, his first, physically in the Cayman  Islands.  After his classroom period ended he would never have to return   **[Kidwai Affidavit ¶6]**

c.      The remainder of Plaintiff's performance would occur in the United States, either where he was performing his clinical rotations, or the place where he studied for and took his Step 1 USMLE exam.  Both of the latter two steps took place in Texas, as did his first attempt at Step 2.  In fact, the USMLE, a key component of contract performance by Kidwai, is not even offered in the Cayman Islands **[Kidwai Affidavit ¶6,]**

37.     Under the notion that the contract is ordinarily just the first step in tying up prior negotiations and future consequences, the actual course of dealing in this case must be evaluated,

*Electrosource, Inc. v. Horizon Battery Technologies, Ltd.*, 176 F.3d 867; *Latshaw v. Johnson*, 167 F. 3d 208.  That evaluation demonstrates that performance was limited in the Cayman Islands, took place significantly in Texas, and that SMU knew, based on its own graduation requirements of clinical rotations and USMLE scores, that Plaintiff's performance would occur substantially outside the Cayman Islands.

38.    Payment of tuition and fees was a further component of contractual performance.  That function was never performed in the Cayman Islands. Plaintiff paid his tuition and fees on his SMU-online account and did so via the Internet, a significant portion of which occurred in Houston, Texas. **[Kidwai Affidavit ¶8].**

39.    Applying the approach setout in *Electrosource* and *Latshaw* the course of dealing between the parties to this contract reveals that at best, 25% of the contract was to be performed in the Cayman Islands.  The remainder would be in the United States and well over half, including all payment obligations, were performed in Texas. If one examines the contract itself, it is clear that the initial offer, ie the application, was completed and transmitted from Texas and that the final acceptance, the *Letter of Intent and Seat Deposit Form* was executed in Texas. Finally, Plaintiff made the first of many tuition payments from Texas. **[Kidwai Affidavit ¶7].**

40.    The contract at issue here was substantially negotiated in Texas, with a person SMU knew was a Texas resident. Thereafter the contract was substantially performed in Texas and never performed in the Caymans again after the first year. SMU clearly took purposeful steps with a person it knew was a Texas resident.  The claim is tied to this specific contract and the breach of the provisions regarding the criteria for graduation.  As such, SMU's actions provide specifically related minimum contacts sufficient to allow for the exercise of personal jurisdiction in Texas.

**B.      Jurisdiction over SMU Based on General Unrelated Contacts:**

41.     Even without its specific related minimum contacts SMU is amenable to the exercise of personal jurisdiction in Texas courts because of its unrelated, general contracts.  The key inquiry with regard to general unrelated contacts is this:  are those contacts so continuous and systematic that a defendant could reasonably anticipate being brought into court to answer for alleged wrongs; *Mink v. AAAA Development LLC,* 190 F.3d 333; *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.,* 176 F.3d 208 ; *McNamara v. Bre-X Minerals Ltd*., 46 F. Supp. 2d 628.

**(i)      Clinical Rotations:**

42.     The starting point is the undisputed evidence that for the last twelve years, 80% of its very short 15 year existence, an average of four students per year do their elective clinical rotations at University of Texas Southwestern Medical School [**Marvin Affidavit §15**].  There is no meaningful distinction between core and elective rotations, one must have both to graduate and therefore they provide an equal part of a student's curriculum **[Kidwai Affidavit §17]**.  While SMU seems to suggest that the absence of core rotations in Texas, as opposed to clinical rotations, has significance [**Marvin Affidavit ¶14**], its admissions in this regard go even further to establish the purposeful, systematic, and continuous contacts with Texas necessary for the exercise of personal jurisdiction.

43.     John Marvin's affidavit states that for the last 12 years SMU has consistently and systematically availed itself of the use of a Texas hospital or hospitals to conduct elective clinical rotations.  For the period preceding that, and perhaps overlapping with it, SMU had students performing core clinical rotations in Texas **[Marvin Affidavit §14].**[1]  Thus, based on SMU's

---

[1]   Marvin indicates that there have been no core clinical rotations in Texas for at least the last ten years.  The affidavit is vague as to the exact period core clinical rotations began, but it can be inferred that from 1997 when the school began until 2002 SMU students conducted core clinical

admissions in this case, for its entire existence it has purposely availed itself of the use of Texas hospitals for clinical rotations.  Again, we do not know how many students, but it is not the quantity of students that matters but the quality of the unrelated contact that is significant, *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806.

44.     Even if just one student per year came to Texas to do clinical rotations the "quality" of that systematic contact makes SMU amenable to jurisdiction of Texas courts.  The test looks to whether or not these unrelated contacts created a situation where SMU could reasonably foresee being brought to court in Texas, *McFaden v. Gerber,* 587 F.3d 753.   The existence of a relationship between a medical school and a hospital for clinical rotation purposes creates duties on the part of both entities.  There has been no jurisdictional discovery conducted in this case that could yield copies of the contracts between SMU and the Texas hospital (s) at which its students perform clinical rotations.  However, a generic contract is attached to Plaintiff's affidavit as Exhibit 2 and it raises a variety of contractual obligations the breach of which by SMU could bring it before Texas courts **[Kidwai Affidavit Exh: 1]**.

45.     Not only could SMU reasonably expect to be sued in Texas based on its student clinical rotation relationship with Texas hospital (s), but it could also expect to be sued in tort.  Clinical rotations provide the opportunity for students to provide hands on medical care for real patients in an actual hospital setting.  These settings therefore provide the opportunity for a medical student to commit malpractice.  Not only is the student potentially liable to a patient, and even the clinical hospital where he committed a tort, but the medical school is likewise susceptible to suit in tort for tis own actions or those of the student. At SMU medical students are required to

---

rotations in Texas.  Based on Marvin's affidavit elective clinical rotations in Texas began in 2000 and have continued uninterrupted since that time.

pay $200.00 per clinical rotation semester for medical malpractice insurance **[Kidwai Affidavit §19]**.

46.     Finally, Not only is SMU's use of a Texas hospital (s) continuous and systematic, but the contact satisfies all three prongs of the test for purposeful conduct, *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574. First, SMU's contacts with the Texas are relevant and are not the unilateral activity of another party or third person.  Contrary to the assertion in its brief that the elective rotation is the act of a "third party" ie a student and not SMU, SMU's catalog and e-mail notice on the issue makes it clear that whether core or elective rotations, SMU must approve the hospital prior to the student application **[Kidwai Affidavit ¶18]**.  John Marvin, the sole source of jurisdictional evidence on this issue cannot support the allegation in Defendant's brief because SMU's policy makes it clear that whether elective or core, clinical rotations are controlled by SMU. Thus the action of approving elective rotations is clearly that of SMU and this undermines SMU's effort to downplay the significance of the clinical rotation contact. Second, the contacts with the forum must be " purposeful" rather than " random, isolated, or fortuitous."   Every year for the last twelve years an average of four students per year have done elective clinical rotations in Texas.   The quality of this contact is not random, isolated or fortuitous. Third, the SMU must seek some benefit, advantage, or profit by ' availing' itself of the jurisdiction.  Each student doing clinical rotations in Texas pays at least one semester's tuition to SMU for doing so.  That is a minimum of $10,000 per student per semester.  Clearly SMU derives a financial benefit from the contact.

**(ii)  Internet as a Source of General Contacts:**

47.     If SMU's Internet contacts were somehow deemed inadequate as a specifically related contact for purposes of jurisdiction, those contacts clearly fall within the category of activity

between a passive and completely active web-site that may be considered in the overall evaluation of a defendant's contacts, *Choice Auto Brokers, Inc. v. Dawson,* 274 S.W.3d 172. A website that provides advertising and some interactivity is more than a passive web-site when considered in total with other unrelated factors and makes SMU amenable to personal jurisdiction.

48.     SMU admits its Internet site is the sole basis of its advertising and marketing, thus its site is much more than those of Bridgestone and Daimler-Benz (see the discussion of each company and the role of tis website in *Bellorin v. Bridgestone/Firestone,* 236 F. Supp. 2d 670; *Daimler-Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 724). Bridgestone and its subsidiary Firestone were national and international companies.  The possessed retail stores and had marketing avenues outside of their website via subsidiaries.  People could and did purchase their products from physical locations and thus the Internet while a component to their business model, was only a part of the total business model.  The same is true of Daimler-Benz.  In both *Bridgestone* and *Daimler* personal jurisdiction was achieved through the subsidiary although the parent had no presence of any kind in Texas. In this case SMU has no other means to market itself other than the Internet, and using that vehicle it draws three-quarters of its student population from the United States. Without it U.S. citizens there would be no SMU. John Marvin specifically referenced the web-site in his affidavit and the SMU student demographics are set out therein.

49.     With an admitted focus on the United States, SMU asserts that the web-site is not specifically directed at Texas, but the reality is that of the ninety students in Plaintiffs class, over ten percent were from Texas **[Kidwai Affidavit §15]**.  The web-site intentionally reaches into Texas among other places and seeks to draw Texas residents to the school.  The alumni page routinely displays Texas residents who have graduated from SMU.

**(iii)  Other Unrelated Factors:**

50.     Not only does SMU recruit students from Texas but it draws faculty from the state as well.  Its web-site openly advertises for employment positions and prominently boasts the hiring of  Dr. Alice Anne Coleman Brunn as an Assistant Professor of Behavioral Sciences. Dr. Brunn was recruited and hired by SMU from Texas in 2007.   In 2010 SMU brought Professor Ned Snyder, the Chief of Clinical Gastroenterology and Hepatology from the University of Texas Medical Branch to the Cayman Islands for its seminar series. Again SMU's web-site specifically identifies faculty brought to SMU on a full or part-time basis **[Kidwai Affidavit §15]**.

51.     SMU faculty travels to Texas for purely professional reasons and did so as recently as March 2010 when Dr. Volodymr Mavrych  and Dr. Olena Bogova traveled to San Antonio for the Clinical Osteoporosis 2010 Symposium **[Kidwai Affidavit §15]**. Defendant contends this is the conduct consistent with a nationally prominent education institution.  However, as should be obvious from its own materials and affidavits, SMU is neither national nor prominent. Defendants site only a non-reported case, *American University Systems, Inc. v. American University,* to support the proposition that SMU's acts are those of a prominent national university.  However, case law that characterizes such institutions focuses on universities such as Columbia or Clemson, i.e.   "national" universities whose prominence is tied to decades, sometimes over a century, of continued existence within a United States education system that recognizes their status.

**(iv) Viewing the General Contacts in "Toto"**

20

52.     As set out in the cases that control the issue of general contact as the basis of in personam jurisdiction, all of the factors must be viewed "in toto" rather than scrutinizing each contact individually.  Therefore, even if general contacts are independent of one another, if they occur in a continuous and systematic manner, they will support general personal jurisdiction, *Access Telecom, Inc. v. MCI Telecommunications Corp,* 197 F.3d 694.  The case that is often sited regarding general contacts is *Gehling v. St. George's Sch. of Med., Ltd.*, 777 F.2d 539, 542 (3d Cir. 1985).  In that case the United States Third Circuit actually declined to find sufficient general contacts to support personal jurisdiction in Pennsylvania.

53.     *Gehling* actually dealt with a Caribbean medical school. In *Gehling* the sole contacts were an advertisement in the New York Times that although was circulated in Pennsylvania, could not be found to have generated any student recruitment.  In addition the school had attended a media swing in Philadelphia designed to boost its status in the United States and had contracted with a Pennsylvania college to provide a joint program to operated and attended in Grenada. Both contacts were found to be inadequate for personal jurisdiction purpose. The Court also found that six percent of the school's total enrollment flowing from Pennsylvania was an inadequate contact upon which to base jurisdiction, *Gehling v. St. George's Sch. of Med., Ltd.*, 777 F.2d 539, 542-44.

54.     *Gehling* was decided almost thirty years ago, and unlike this case, the contacts in that case would not have created a reasonable anticipation that St. George's could be sued in Pennsylvania.  However, in this case, SMU has established and continuously maintains contacts with Texas, through today, that present a very real and on-going possibility of suit in Texas.  The twelve-year long clinical rotation contact with Texas by itself is sufficient to meet the general minimum contact requirement.  The contractual relationship between the Texas hospital (s) and

21

SMU by itself provides the basis for litigation in Texas.  When combined with the potential tort liability created with an average of four students a year doing clinical rotations in Texas, it is unreasonable not to anticipate that SMU could be haled to court in Texas.  St. George's had no such continuous and systematic contact in Pennsylvania.

55.     The times and the law have both changed since *Gehling*.  Internet did not even exist in 1985 and the body of law that has developed surrounding its use establishes both related and unrelated contacts that did not exist 30 years ago.  Even if SMU's website is not "active" enough to establish sufficient general contacts by itself, when combined with SMU's other instances of continuous, purposeful availment, SMU's general contacts are adequate for this court to assert personal jurisdiction over SMU.

**C.     Jurisdiction Over the Trustees Based on Specifically Related Contacts:**

56.     Plaintiff has sued the three trustee defendants for intentional misrepresentation.  As an intentional tort, it establishes a sufficient prima facie case to assert personal jurisdiction over them in Texas.  Consistent with the Fifth Circuit, for purposes of long-arm tort jurisdiction under Texas law the tort is committed where the resulting injury occurs, *Hupp v. Siroflex of America, Inc.* 848 F. Supp. 744.

57.     Defendants do not debate that the resulting injury has occurred in Texas.  Rather, their brief claims that an intentional tort cannot be sustained because when the trustees made the representation of graduation requirements in 2007 they could not know it was false or would be changed, thus negating the possibility the act was "intentional."  The Defendants provide no evidence of that fact and the Plaintiff's jurisdictional evidence clearly demonstrates that from 2007  when the Plaintiff matriculated into SMU, the trustees were already moving to change the policy and met resistance from the faculty committee [**Exhibit B: Nassar Affidavit §3, 7**].

Despite knowing that the change was being pushed and would continue to be pushed, the trustee and SMU never made the proposed change a matter of public record until it was implemented in May 2010 [**Nassar Affidavit §6; Kidwai Affidavit §9, 11**].

58.      Therefore, not only has the Plaintiff properly pled an intentional tort, but the jurisdictional evidence supports the fact that the trustees knew that the graduation policy would changed and purposely withheld any notice of the change until the change was actually implemented.   Defendants do not deny the harm has occurred in Texas and under the clear 5th Circuit and U.S. Supreme Court case law the trustees' knowingly intentional act is more than sufficient to make them amenable to jurisdiction in Texas , *Wien Air Alaska v. Brandt,* 195 F.3d 208, 213 and *FCA Invs*., 2002 WL 31049442, *Lewis v. Fresne*, 252 F.3d 352, 358-59; *J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780, 2787.

**D.      Defendant Trustees' General Contacts As a Basis of Jurisdiction:**

59.      The only evidence with regard to general contacts by the trustees with Texas are their affidavits.   Those affidavits are at best inconclusive, particularly given that there has been no discovery in the case that would shed light on the assertions made therein.   It is significant that all three affidavits assert that the trustees have no general contacts or travel to Texas in connection with SMU, but make no such assertion regarding non-SMU contacts [**Croley Affidavit §6; Cooper Affidavit §6, Docherty Affidavit §7**].   General contacts are just that, general.   They do not have to be connected to the basis of the suit.   They have to be extensive enough for a defendant to anticipate he could be brought to court in Texas, not necessarily brought to court in connection with the specific litigation giving rise to liability, *Access Telecom, Inc. v. MCI Telecommunications Corp,* 197 F.3d 694, *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.,* 176 F.3d 208; *McNamara v. Bre-X Minerals Ltd*., 46 F. Supp. 2d 628.

60.    We do know that Defendant Docherty, although not a defendant, has general contacts with Texas regarding *State of Texas ex rel Allen Jones v. Janssen L.P., Johnson & Johnson, et. al,* Cause No. D-1-GV-04-001288 in the 250gth Judicial District Court of Travis County, Texas. The extent of Docherty's contacts regarding the underlying facts of this case or his general contacts with Texas in a more broad sense remain unknown, although his affidavit, like those of Croley and Christopher raises the question of significant general contacts unrelated to SMU.

61.    A Plaintiff who sues an out-of-state corporation and who makes out a "colorable case" for the existence of personal jurisdiction may be entitled to conduct jurisdictional discovery if the defendant asserts a jurisdictional defense. *Sunview Condo. Ass'n v. Flexel Int'l, Ltd*., 116 F.3d 962, 964 (1st Cir. 1997). The district court has broad discretion to determine whether or not such discovery is warranted, *Nordica USA Corp. v. Ole Sorensen*, 475 F. Supp. 2d 128 (D.N.H. 2007). Plaintiff contends that he has made out more than a colorable case for jurisdiction and that if the decision whether to retain jurisdiction or dismiss based on a lack thereof, is to turn on information that exists, but the parties have not exchanged, Plaintiff requests the opportunity to conduct jurisdictional discovery.

**E.    Litigation in Texas Does not Violate Traditional Notions of Fair Play:**

62.    Defendants believe Florida satisfies the requirement that jurisdiction not offend traditional notions of fair play. Returning to the standards as set out by the United States Supreme Court the following factors must be considered: 1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering

fundamental substantive social policies. *See Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 113, 107.

63.     If we look to the burden on the Defendants it is unclear why Texas is any more burdensome than any other forum.   Although SMU has some relationship with another corporation that allows it an administrative office in Florida, there is no evidence that any of the school's employees factually involved in the case are even located there. Based on Defendants' affidavits the individual defendants reside in New York, Florida and Oregon.   The argument is that Grand Cayman is hundreds of miles closer to Orlando than Houston, Texas. In reality that is a meaningless distinction.   A cursory review of a major travel site reveals that each city is serviced from the Grand Cayman by four major airlines, offering 20 flights daily of varying duration and different connections.   However only Houston, Texas has a direct flight from Cayman.[2] While one trustee lives in Florida, another is in Oregon, and Orlando is almost twice as far from Oregon as Houston, Texas.   In short, either forum creates a burden for some defendants, but in total, Texas presents no greater a burden than Florida.

64.     The forum state's interest in resolving the dispute mitigates towards jurisdiction in Texas. Defendants rest their argument against Texas on the assertion that the events giving rise to the lawsuit occurred in Florida or the Cayman and therefore Texas has a far less compelling interest, citing *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995).   As set out herein above both factually and legally that is not true.   The tort clearly occurred in Texas based on the place where the harm occurred, *Wien Air Alaska v. Brandt,* 195 F.3d 208, 213; *FCA Invs.,* 2002 WL 31049442;  *Lewis v. Fresne*, 252 F.3d 352, 358-59; *J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780, 2787.

---

[2] Plaintiff used Travelocity and had travel dates of May 26, 2012 returning to Cayman on May 28, 2012.  There is a direct Cayman-Houston flight at 5:02 p.m., arriving Houston at 8:02.

65.     The third factor, the Plaintiff's interest in litigating in Texas could hardly be more compelling.  After spending $250,000 on his education of which $100,000 went directly to the Defendant SMU, the ability to financially continue the fight rests in great part on being able to literally litigate at home.    Not only has Plaintiff exhausted his financial resources, but because he has no degree, his ability to earn a living is significantly diminished.  Regardless of the law, the logistics and added cost of having to prosecute this case in Florida weigh heavily in favor of litigating in Texas when the Defendants are so widely spread out across the country.  The only real effect of moving the case to Florida would be to financially crush the Plaintiff.

66.     The fourth factor, the interest of the interstate judicial system does not support personal jurisdiction in Florida or defeat personal jurisdiction in Texas.  The burden on witnesses and the gathering of evidence is no greater in Texas than it would be in Florida.  In both scenarios every witness but one will travel a great distance.  If in Texas the Plaintiff does not travel, but Florida guarantees only that one trustee will not travel.  The documents are such that virtually everything can be produced electronically or by mail.  Thus, given the fact that the Defendants' argument fails as to where the acts occurred that give rise to the claims, the needs of the interstate judicial system does not support a dismissal of this case based on lack of jurisdiction in Texas.

67.     Finally, the shared interest of the several states in furthering fundamental social policies again mitigates toward Texas.  SMU admits that it chose to do business with a Texas resident and the facts are clear that Plaintiff is not the only Texas resident and/or entity it chose to do business with. It has a relationship with a Texas hospital (s) that spans over a decade and provides a consistent situs for advancing the educational goals of the school as well as providing more than a reasonable basis that SMU could be sued in Texas.  Again, based on the facts, the educational experience at SMU is far from "centered in the Cayman Island."  Not even half of

SMU's total curriculum takes place in Cayman and beyond clinical rotations, essential hurdles like the USMLE not only take place exclusively in the United States, but in this case took place in Texas **[Kidwai Affidavit §6-8, 11]**.

## V. Conclusion

This Court has personal Jurisdiction over Defendant SMU based on specifically related and general minimum contacts with Texas. In addition, it has personal jurisdiction over the trustee Defendants based on specifically related minimum contacts. Jurisdiction does not offend traditional notions of fair play and for these reasons Defendants' Motion to Dismiss should be denied. As to the Defendant trustee's general contacts with Texas, there has been insufficient discovery to ascertain to what degree they have such contacts and whether those contacts would sustain jurisdiction.  To the extent necessary to fairly evaluate this aspect of personal jurisdiction Plaintiff would request the opportunity to conduct jurisdictional discovery on any issue where the resolution of the question of personal jurisdiction hinges on evidence that may exist but could not be presented herein.

Respectfully Submitted,

/S/ Mark A. Weitz_____
Mark A. Weitz
SB# 21116500
SD Bar # 102493
Weitz Morgan PLLC
100 Congress Avenue, Suite 2000
Austin, Texas 78701
512-394-8950 (direct)
512-657-1849 (mobile)
512-852-4446 (facsimile)
ATTORNEY FOR PLAINTIFF
MARAJ KIDWAI

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of May, 2012, I served all of the Defendants in this case with a true and correct copy of the foregoing Plaintiff's Response to Motion to Dismiss by serving their attorneys of record, Daryl Lapp and Joseph Rutkowski of Edwards Wildman 111 Huntington Avenue, Boston, MA 02199-7613 ands Sean Becker and Christie Alcala of Vinson Elkins at First City Tower, 1001 Fannin Street, Suite 2500, Houston, Texas 77002-6760 by electronic service.


/S/ Mark A. Weitz_____
Mark A. Weitz